**In re AYRES AVIATION HOLDINGS, INC., Debtor.**

**First National Bank of South Georgia, Plaintiff,**

v.

**Proceeding Ayres Aviation Holdings, Inc., Defendant.**

**General Electric Company, Defendant.**

**Bankruptcy No. 00–11881.**
**Adversary No. 01–1003.**

United States Bankruptcy Court, M.D. Georgia, Albany Division.

March 31, 2006.

1. *In re Kirby,* 223 B.R. 825, 830 (Bankr. M.D.Fla.1998).

2. *Id.*

3. *Id.*

4. *In re Driscoll,* 179 B.R. 664, 666 (Bankr. D.Or.1995)

5. *Id.* at 665.

6. *Id.*

Jesse C. Stone, Merrill & Stone, LLC, Swainsboro, GA, for Debtor.

### MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

This case is back before the Court on remand from the United States District Court for the Middle District of Georgia by Order of the Honorable W. Louis Sands, Chief Judge. The case has been remanded to this Court for the sole purpose of determining the following two issues: (1) Whether Ayres Aviation Holdings, Inc. properly raised the legal issue of whether it was a "buyer in ordinary course of business"; and (2) Whether Ayres Aviation Holdings, Inc. was in fact a "buyer in ordinary course of business." Like the subject matter of the appeal to the district court, these issues pertain solely to a determination of the ownership and/or lien interests in General Electric aircraft engine serial number GE–E–685998 (hereinafter, the "998 engine").

### PROCEDURAL HISTORY

On November 27, 2000, Ayres Aviation Holdings, Inc., Ayres Corporation, and the Fred P. Ayres Company, Inc. filed for Chapter 11 protection under the United States Bankruptcy Code. These cases were consolidated for joint administration by order dated November 27, 2000.

On February 8, 2001, First National Bank of South Georgia (hereinafter, "First National") filed this adversary proceeding in the case of Ayres Aviation Holdings, Inc. (hereinafter, "Debtor"). In its complaint, First National asked that the Court determine the validity, priority, and extent of liens and interests in two General Electric aircraft engines, which secured credit extended by First National to Debtor. The engines were installed on an aircraft in Debtor's possession. Debtor, Ayres Aviation Holdings, Inc., Zlatava Davidova, Trustee of LET, a.s. (hereinafter, "LET"), and GATX Capital Corporation (hereinafter, "GATX") were named as defendants in the original complaint. General Electric Company (hereinafter, "GE") was later added. In its answer, Debtor asserted cross-claims and counterclaims and sought determination of the interests in the L610 aircraft as well as the two GE engines.

On August 7, 2002, this Court conducted a trial on First National's complaint and on the cross-claims and counterclaims of Debtor. On August 21, 2002, the Court entered its memorandum opinion and order. The Court held that Zlatava Davidova, Trustee for LET, did not carry her burden to prove substantive Czech Republic law on the issues before the Court and ruled as follows: (1) GE was the title owner of the 998 engine, free and clear of any interests of Debtor, GATX, Zlatava Davidova as Trustee for LET, or First National; (2) The bill of sale between LET, a.s. and Debtor transferred ownership in the 002 engine to Debtor and, therefore, First National had a valid and perfected security interest in the 002 en-

gine; (3) The bill of sale transferred ownership of the L610 aircraft to Debtor and the aircraft was, consequently, part of Debtor's bankruptcy estate; and (4) GATX's motion for relief from stay was denied.

On October 11, 2002, the Court held a hearing on the motion of Zlatava Davidova, Trustee for LET, to reconsider the Court's August 21, 2002 Memorandum Opinion and Order. The Court issued a final memorandum opinion and order on November 4, 2002 in which the Court held: (1) The bill of sale between LET and Debtor did *not* transfer ownership in the L610 aircraft to Debtor; therefore, the aircraft was not part of Debtor's bankruptcy estate; (2) GE was the title owner of the 998 engine free and clear of any claims of interest asserted by Debtor, Zlatava Davidova, Trustee for LET, GATX, or First National; (3) The bill of sale between LET, a.s. and Debtor *did* transfer ownership of the 002 engine to Debtor; therefore, Debtor's pledge of the engine as security for First National's extension of credit was valid. Consequently, First National held a valid perfected security interest; and (4) The motion of GATX for relief from stay was denied.

Debtor filed a notice of appeal on November 14, 2002. On November 25, 2002, Zlatava Davidova, on behalf of LET, filed notice of cross-appeal. On March 30, 2004, the district court entered an order vacating this Court's November 4, 2002 decision and directed the Court to reconsider First National's complaint in light of additional Czech Republic law presented on appeal. On July 7, 2004, the Court held a hearing in accordance with the order of the district court. At the hearing, Debtor, LET, and First National announced a settlement; GE was not a party to the settlement, however.

The Court approved the proposed settlement on November 10, 2004. The settlement decreed that Debtor had ownership of the L610 aircraft free and clear of other liens or interests except for the lien of First National on the 002 engine. In light of the settlement, the district court "denied as moot as to the L610 aircraft and 002 engine," the appeal of Debtor and LET, of the order entered by this Court on November 4, 2002. The only issue considered by the district court on appeal was the ownership and lien status of the 998 engine.

On that issue, the district court held that a bailment agreement existed between GE and LET and that at no time did GE expressly or impliedly consent to LET's transfer of the 998 engine. The district court noted, however, Debtor's citation of Official Code of Georgia Annotated (hereinafter, "O.C.G.A.") § 11–1–201(9) to support its argument that Debtor was a "buyer in ordinary course of business." The district court stated that it could not rule on the issue of "buyer in ordinary course of business" since the issue was neither developed in the record of this Court nor explicitly considered by this Court in reaching its conclusion. The issue of whether Debtor was a buyer in ordinary course of business was remanded to this Court for consideration and ruling assuming this Court determines the issue was timely raised by Debtor.

### *FINDINGS OF FACT*

The following facts are limited to those pertinent to the issues currently before the Court.

In or about September 1998, Debtor acquired approximately ninety-three percent (93%) of the outstanding equity interests in LET a legal entity organized under the laws of the Czech Republic. Fred P. Ayres is the sole shareholder and director

of a corporation known as Ayres Corporation. Fred P. Ayres was a director of Debtor Ayres Aviation Holdings, Inc., but was not involved in the daily operations of the company.

On or about May 19, 2000, Fred P. Ayres executed in the name of LET Aeronautical Works a bill of sale intended to convey to Debtor an L610 aircraft (Serial No. 0301) manufactured by LET. The L610 was equipped with two General Electric engines, serial numbers GE–E–685998 (hereinafter, the "998 engine") and GE–E–685002 (hereinafter, the "002 engine").

The L610 and its two engines were located in the United States at the time the bill of sale was executed and delivered. Debtor actually took delivery of the L610 aircraft during the summer of 1999, prior to the execution and delivery of the bill of sale. After taking control of the L610, Debtor repainted the aircraft, renamed the aircraft the Ayres 7000, and took the aircraft on a worldwide tour with stops in such places as Dubai, Bahrain, Oman, Singapore, Arizona, Las Vegas, Miami, Virginia, Thunder Bay, Canada, Brazil, and Peru. Debtor provided the funds necessary to take the L610 on tour and funded efforts to market the aircraft worldwide. The marketing expenses totaled approximately $500,000.

Fred P. Ayres determined the value of the L610 at the time of transfer to be one million dollars ($1,000,000 USD). Mr. Ayres arrived at the value using the values of the engines, the propellers, and the avionics since the aircraft was not yet certified in the United States. Debtor paid for the L610 aircraft by "transferring avionics" to LET both before and after the transfer of the L610 aircraft and both before and after the bill of sale was executed and delivered.

Debtor Ayres Aviation served as "the buyer[ ] of all the avionics for LET and shipped [the avionics to LET]." LET had no buying power in Europe but needed to purchase U.S. avionics systems with which to replace the Russian systems that had been installed in the aircraft LET manufactured. The value of avionics transferred from Debtor to LET totaled $1.2 million.

Debtor transferred the avionics to LET "without charge." Debtor and LET agreed that in exchange for the transfer of the L610 aircraft and the two GE engines, LET would not have to repay Debtor the cost of the avionics or the marketing expense incurred by Debtor. Fred P. Ayres discussed with Turner Bostwick, director general for LET following the acquisition of LET by Debtor, that the L610 aircraft was being transferred to Debtor Ayres Aviation in return for "continuing considerations of the avionics" that Debtor was sending to LET. No written agreement existed declaring that the L610 aircraft and its two engines would be transferred in exchange for the forgiveness of debt owed, but such an exchange was the admitted nature of the transaction. LET never paid Debtor for the avionics it received or for the expenses associated with marketing the L610 aircraft.

### DISCUSSION AND CONCLUSIONS OF LAW

As mentioned above, two issues are currently before the Court: first, whether Debtor properly raised the issue of whether it was a buyer in ordinary course of business; and second, if the issue was properly raised, whether Debtor was a buyer in ordinary course of business.

**I. Whether Debtor Ayres Aviation Holdings, Inc. properly raised the issue of whether it was a "buyer in ordinary course of business"**

The parties are in agreement that the issue of whether Debtor was a buyer in

ordinary course of business is tied directly to the issue of whether GE negligently entrusted the 998 engine to a merchant LET who deals in goods of that kind and in so doing gave LET the right to transfer all rights of the entruster, GE, to a buyer in ordinary course of business.

GE concedes that the issue of negligent entrustment was raised in the pre-trial order but that it was raised by GATX, a former party to the adversary proceeding that withdrew before trial. Upon GATX's withdrawal, the Court struck the responsive pleadings filed by GATX. GE contends that it is arguable that GATX's portion of the pre-trial order that addressed negligent entrustment was struck with the responsive pleadings. GE submits, however, that the concept was at least argued prior to the Court's issuing its August 2002 opinion and, therefore, the issue was probably properly raised.

Debtor by way of arguing that the issue of whether it was a buyer in ordinary course of business was properly raised in this Court, likewise points to argument made on the issue during the trial. Both parties having conceded that the issue was at least raised and the Court, recognizing that argument on the issue was made at trial, concludes that the issue of whether Debtor was a buyer in ordinary course of business was indeed properly raised by Debtor before this Court.

## II. Whether Debtor Ayres Aviation Holdings, Inc. was a buyer in ordinary course of business of General Electric engine 998

The Court having held above that Debtor properly raised at trial the issue of whether it was a buyer in the ordinary course of business submits that the Court considered the arguments of Debtor on the issue but was not persuaded. The issue would have been a most fundamental bar-

rier to the Court's opinion issued November 4, 2002. Despite the fact that the Court could not have concluded the way that it did unless it found in the process of its careful consideration that Debtor was *not* a buyer in the ordinary course of business, the Court will now, for the benefit of the parties and at the direction of the district court, provide an analysis of the issue.

### A. O.C.G.A. §§ 11–2–403(2) and 11–1–201(9)

The transaction at issue is the transfer of the L610 aircraft and its two General Electric engines (engines 002 and 998) from LET to Debtor. It is the task of the Court to determine whether O.C.G.A. § 11–2–403(2) is implicated so as to extinguish the ownership rights of General Electric in engine 998 upon transfer of the engine and L610 aircraft to Debtor. Section 11–2–403(2) provides: "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a *buyer in ordinary course of business.*"

Debtor urges the Court to hold that Debtor was in fact a buyer in ordinary course so as to trigger the operation of O.C.G.A. § 11–2–403(2). Should the Court hold as much, then under O.C.G.A. § 11–2–403(2), Debtor would have taken engine 998 free and clear of the legal and equitable interests of General Electric. Rather than considering each of the elements of Section 11–2–403(2), the Court has only been instructed to decide whether Debtor Ayres Aviation was a "buyer in ordinary course" as is in part required by that section.

The Georgia Commercial Code defines "buyer in ordinary course of business" at O.C.G.A. § 11–1–201(9). That code section provides:

(9) "Buyer in ordinary course of business" means a person that buys goods in good faith without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in the ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Article 2 of this title may be a buyer in ordinary course of business. A person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt is not a buyer in ordinary course of business.

■ This Court stated in *In re Palmer* that O.C.G.A. § 11–1–201(9) requires that a buyer in the ordinary course of business: (1) purchase in good faith; (2) purchase without knowledge that the sale to him is in violation of any security agreement; and (3) purchase goods in the ordinary course from a person in the business of selling goods of that kind. In addition, however, Section 11–1–201(9) also declares what is *not* a buyer in the ordinary course of business. The last sentence of the Section reads: "A person that acquires goods in a transfer in bulk or as security for *or in total or partial satisfaction of a money*

*debt is not a buyer in ordinary course of business.*"

The Eleventh Circuit Court of Appeals considered this portion of O.C.G.A. § 11–1–201(9) in *Sterling National Bank & Trust Co. of New York v. Southwire Co.* In that case, Sterling National Bank (hereinafter "Sterling National") advanced Metric International, Inc. (hereinafter, "Metric"), a metals dealer, nearly $4 million along with making other periodic advances of funds. Sterling National took a broad security interest in the metals Metric dealt. In a supplement to the financing agreement, Metric agreed that "[E]xcept for sales in the regular course of business, we shall not sell ... any collateral without [Sterling National's] prior written consent."

Metric had a "tolling" or "conversion" contract with Southwire Co. (hereinafter, "Southwire"), which purchased and sold copper scrap and copper cathode, and itself processed and converted copper scrap into copper cathode. The tolling contract required that Metric deliver 200,000 pounds of copper scrap to Southwire each month and pay 10.5 cents per pound to Southwire for conversion of the scrap into cathode. In exchange, Metric could draw a proportionate amount of cathode for sale to its customers.

At the end of May 1978, Southwire held 476,000 pounds of surplus cathode belonging to Metric, but Metric owed Southwire approximately $175,000 in conversion charges, a preexisting debt. In order for Metric to secure release of cathode to one of its customers, Metric had to transfer 265,000 pounds of cathode at 66.2 cents per pound to Southwire. The transfer was in payment of the conversion charges. Southwire then released 200,000 pounds of cathode to Metric's customer.

Subsequent to the transfer of cathode, Metric filed for bankruptcy. Sterling Na-

tional contacted Southwire to verify that it held nearly 3 million pounds of cathode belonging to Metric. Southwire reported that it only held approximately 12,000 pounds. Sterling National sued Southwire for converting the cathode transferred to it by Metric. The district court granted summary judgment in favor of Sterling National. Southwire appealed.

The Eleventh Circuit determined that "sale in the regular course of business," as used in the financing agreement between Metric and Southwire, did not require that Southwire be a "buyer in ordinary course" as defined in the Georgia Commercial Code. The court did, however, state in dicta that Southwire, under O.C.G.A. § 11-1-201(9), would *"not* [be] a 'buyer in the ordinary course of business,' because the transfer was in satisfaction of a debt." In the end, the Eleventh Circuit affirmed the district court's ruling that after an examination of the transfer it was clear that the setoff was not a sale in Metric's regular course of business.

The United States Bankruptcy Court for the Middle District of Alabama reasoned likewise in the case of *Ford Motor Credit Co. v. Dothan Lincoln–Mercury Co., Inc.* In that case, two individuals had loaned the debtor car dealership $100,000. One of the individuals requested that the dealership order him a new automobile and the parties agreed that the debtor dealership would accept as payment for the vehicle a reduction in the $100,000 debt it owed. The lender never took delivery of the vehicle. Instead, the dealership delivered the vehicle to its attorney to secure payment of attorneys fees. The attorney demanded payment of $5,000 from the lender and upon payment released the vehicle to the lender. The lender thereafter, gave the debtor a $15,000 credit on the debt it owed.

The sole issue in the case was whether the lender was a "buyer in ordinary course of business." If the lender was a buyer in ordinary course, then he would take free and clear of the security interest of the inventory creditor of the debtor, Ford Motor Credit. Although the bankruptcy court recognized that the lender "bought" the vehicle in good faith and without knowledge that the sale to him violated the ownership rights of Ford Motor Credit, the court nonetheless ruled that the lender was *not* a buyer in ordinary course of business since the vehicle was "paid for in large part by a reduction of the debt, which was owed to him by the debtor." The court stated in its holding, "This takes [the lender] out of the category of 'buyer in ordinary course of business' and makes his rights to the vehicle subject to the rights of Ford Motor Credit." The court relied on the plain meaning of the last sentence of Alabama U.C.C. Section 7-1-201(9), which is almost identical to the last sentence of O.C.G.A. § 11-1-201(9). The Alabama statute provides: " 'Buying' . . . does not include a transfer in bulk or as security for or in total or partial satisfaction of money debt."

### B. Fractionalizing and Plain Meaning

Section 11-1-201(9) of the O.C.G.A. is clear on its face. Some courts have held that when applying the last sentence of this provision of the U.C.C. courts should "fractionalize" the transfer, labeling the transferee a buyer in ordinary course as to the extent of the purchase price that is not in satisfaction of a money debt, but *not* a buyer in ordinary course to the extent the transferee paid for the transferred goods with the satisfaction of a money debt. Agreeing with the bankruptcy court in *Dothan Lincoln–Mercury Co.,* this Court believes such application of Section 11-1-201(9) would be an improper "judicial

amendment of clearly worded statutory language." Section 11–1–201(9) simply does not allow for fractionalizing. Either a buyer is a buyer in ordinary course of business or a buyer is not; the statute simply doesn't allow for the judicial parsing of a transfer. Further, such application of the statute is consistent with the approach of the Eleventh Circuit Court of Appeals in *Sterling National Bank* explained above.

In oral argument, counsel for Debtor Ayres Aviation cited *General Electric Credit Corp. v. R.A. Heintz Construction Co.* for the proposition that where any portion of the purchase price is not in satisfaction of a money debt, then the cash payments render the purchaser a buyer in ordinary course of business *as to the entire transfer*. The *Heintz* case concerned the rights of the parties in four pieces of heavy machinery. The United States District Court for the District of Oregon, applying interpretations of a similar provision in the Uniform Trust Receipts Act, held "[i]t would be completely inconsistent with the announced policy to penalize a purchaser who qualified as a 'buyer in the ordinary course of business,' by 'fractionalizing' the entire transaction and making the sale part good and part bad."

It must be noted when considering the decision in *Heintz* that the transaction involved four individual pieces of machinery and that both cash and forgiveness of debt were paid for the machinery. Not only is the holding in *Heintz* inconsistent with the Eleventh Circuit Court of Appeals' interpretation of the commercial code provision at issue, but it also concerns facts wholly different from the facts before the Court in this case. It was the sworn testimony of Fred P. Ayres that the L610 aircraft and its two General Electric engines were paid for fully with the satisfaction of a money debt owed to Debtor Ayres Avia-

tion by LET. Not even a portion of the sale price for the aircraft was paid in cash. Not only is this case distinct from *Heintz*, the Court cannot find authorization for such a holding in the statute. The Court will not, therefore, follow the ruling in *Heintz*.

## C. Application

In the case at bar, it is clear to the Court that the last sentence of O.C.G.A. § 11–1–201(9) is outcome determinative. Although counsel for Debtor concludes in its brief to the Court that Debtor was clearly a "buyer in ordinary course," counsel failed to include in its recital of Section 11–1–201(9) that a buyer in ordinary course of business is *not* "[a] person that acquires goods in a transfer . . . in total or partial satisfaction of a money debt . . . ." The Court cannot so easily ignore that portion of the definition.

In applying Section 11–1–201(9), the Court looks first to the testimony of Debtor's principal, Fred P. Ayres, given at the August 7, 2002 trial before this Court. In his testimony, Mr. Ayres explained how after Debtor purchased ninety-three percent (93%) of LET in or about September 1998, Debtor served as "the buyer[ ] of all the avionics for LET and shipped [the avionics to LET]." Mr. Ayres stated that Debtor transferred the avionics to LET "without charge." The value of the avionics transferred, according to Mr. Ayres, totaled $1.2 million.

It was also Mr. Ayres' testimony that during the summer of 1999, Debtor took delivery from LET of an L610 aircraft equipped with two General Electric engines. The value of the aircraft and its two engines was determined by Mr. Ayres to be $1 million at the time of transfer. After taking delivery, Mr. Ayres stated, Debtor repainted the L610, renamed it the Ayres 7000, and took the aircraft on a

worldwide marketing tour. Debtor incurred costs totaling nearly $500,000 in marketing the aircraft. Debtor was never paid by LET for these marketing expenses. A bill of sale for the transfer of the L610 was not executed and delivered until May 19, 2000.

Mr. Ayres explained to the Court that even though no written agreement existed declaring as much, Debtor agreed that, in exchange for the transfer of the L610 aircraft, LET would not have to repay Debtor the cost of the avionics or the cost of marketing the L610. Mr. Ayres testified that Debtor paid for the L610 aircraft by "transferring avionics" to LET both before and after the transfer of the L610 aircraft.

It is clear to the Court that prior to the transfer of the L610 aircraft and its two engines from LET to Debtor, whether that transfer occurred when Debtor took actual possession of the aircraft in the summer of 1999 or when the bill of sale was executed in May of 2000, Debtor was owed a monetary debt for avionics purchased by Debtor and shipped to LET. The amount of the monetary debt owed by LET would vary depending on whether the transfer is deemed to have occurred when Debtor took actual possession of the L610 in the summer of 1999 or when the bill of sale was executed and delivered in May of 2000. In previous proceedings, it appeared to be the understanding of the parties that the transfer occurred at the time the bill of sale was executed and delivered, but such a determination is not necessary for the Court to reach a conclusion on the issue before the Court today. The evidence is that a monetary debt owed to Debtor existed before the L610 was transferred and that Debtor paid for the aircraft with the satisfaction of that debt. It being the sworn and unrefuted testimony of Fred P. Ayres that Debtor accepted the aircraft and its two engines in exchange for the forgiveness of debt owed by LET to Debtor, the Court can come to no other conclusion than that Debtor was *not* a buyer in ordinary course of business of the General Electric engine 998.

It is unnecessary for the Court to consider whether Fred P. Ayres and Debtor had "knowledge that the sale violat[ed] the rights of another person in the goods . . . ." as is heavily briefed and argued by counsel for Debtor. Debtor cites the case of *Hanington v. Palmer* where this Court held that the special relationship of a purchaser to a seller does not necessarily itself preclude the purchaser from being a buyer in ordinary course. The Court's holding in the instant case is not impacted by the special relationship Fred P. Ayres had at the time of the transfer with both LET as transferor and Debtor as transferee. The Court's holding rests solely on the application of O.C.G.A. § 11–1–201(9) to the evidence that the L610 aircraft was paid for with the total or partial satisfaction of a money debt.

## CONCLUSION

It is for the reasons stated that the Court clarifies its decision of November 4, 2002 and now holds that the issue of whether Debtor Ayres Aviation was a buyer in ordinary course of business was properly raised before this Court and that Debtor Ayres Aviation was not a buyer in ordinary course of business of General Electric engine 998 so as to extinguish the ownership rights of General Electric in said engine. General Electric, therefore, holds and maintains all rights of ownership and possession in GE engine 998.